UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| AMY C. PIGOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:11-cv-00764 |
| v. | ) | |
| | ) | Judge Sharp |
| BATTLE GROUND ACADEMY | ) | |
| and JOHN W. GRIFFITH, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

*Laissez-moi tranquille*—"Leave me alone"—more or less describes Amy C. Pigott's attitude toward her employment at Battle Ground Academy ("BGA"). She enjoyed her job teaching high school French, received favorable evaluations from colleagues and supervisors, and was evidently making no plans to resign or retire. School headmaster John W. Griffith, on the other hand, was dissatisfied with Pigott. He instructed her to obtain a master's degree in French in order to continue teaching, pursuant to an unwritten policy requiring most teachers to have a bachelor's or graduate degree in the primary subject they teach. After Pigott failed to enroll in a master's program, and after she complained to a member of BGA's Board of Directors that she was being unfairly singled out by Griffith, he fired her. She alleges that the master's degree requirement was a pretext for age discrimination, and that she was discharged because she was too old and had complained of age discrimination. BGA responds that Pigott was straightforwardly terminated because she failed to honor the master's degree commitment she made, which was an express condition of her continued employment. However, that condition was not included in Pigott's written contract, and the degree requirement policy was

1

never reduced to writing, nor have Defendants accounted for its inconsistent enforcement. Lacking better records but with no lack of disputed factual issues, this case will turn on credibility determinations that only a jury can make. As such, summary judgment is inappropriate on most of Plaintiff's claims.

## FACTS[1]

Plaintiff Amy C. Pigott began her tenure at Defendant BGA in 1999, when she was hired to teach English and French at the private school located in Williamson County, Tennessee. Plaintiff held a bachelor's degree from the University of Tennessee in English, with minors in French and Psychology, and was certified by the state to teach all three subjects at the high school level. She had taught French and English in public and private schools for approximately 27 years. After teaching English and French at BGA from 1999-2005, Plaintiff was reassigned to teach French and work part-time in the college counseling department. When interpersonal conflict developed between Plaintiff and the director of college counseling, she was reassigned to teach exclusively French classes, effective fall 2007. For the entire 2007-08 school year and the 2008-09 school year, she taught French classes. Until the end of this time period, her lack of a degree in French was not remarked upon by her superiors.

Defendant John W. Griffith was hired as Head of School at BGA in fall 2005 and served in that position at the time of the events giving rise to this lawsuit. As Head of School, he oversaw all of BGA's operations, including its Lower, Middle, and Upper

---

[1] Unless otherwise noted, all facts are drawn from Defendant's statement of undisputed material facts (Docket No. 14), Plaintiff's responses thereto (Docket No. 21), and Defendants' reply (Docket No. 25), as well as all related exhibits. Although facts are taken from submissions made by both parties, on a motion for summary judgment, the Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. ZenithRadio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

2

Schools, and had ultimate authority over spending and employment decisions. He, and he alone, reported directly to the school's board of directors. Griffith held a bachelor's degree, a Master's degree, and a Ph.D. in English literature. Among his priorities for BGA was to "upgrade" the faculty so they would "look better on paper." In other words, he wanted to have more faculty members with graduate degrees, and particularly Ph.Ds, in the Upper School. Griffith required Upper School faculty members to have a bachelor's or master's in the subject they taught, except for those faculty members who were responsible for overseeing substantial extracurricular activities like athletics, yearbook, or theater. This policy was not put in writing. As of 2011, approximately 70 percent of BGA Upper School faculty members held advanced degrees.

In spring 2009, Griffith informed Plaintiff that she needed to begin working to obtain a master's degree in French or he could not guarantee her continued employment the following year at BGA. He said that there had been no negative evaluations or complaints about her performance and that the basis for his instruction was just a matter of having a master's degree in the subject she was teaching. He did not give her the option of taking further undergraduate courses in order to convert her minor into a bachelor's in French. Plaintiff, surprised by the sudden directive, informed Griffith that she would not be able to pursue a master's degree that summer because she had already made arrangements to participate in a foreign language immersion program in Lyon, France. She also expressed interest to Griffith around this time in teaching English classes once again. In light of Plaintiff's enrollment in the summer program, Griffith agreed that she would not be required to begin pursuing her master's degree that summer. Plaintiff traveled

abroad for her professional development program as planned and resumed teaching the same load of four French classes in fall 2009.

In January 2010, Stan Rupley, Director of Studies at the Upper School, told Plaintiff that Griffith was inquiring about her progress on beginning her master's degree. She informed him that she had not taken any action. Her plan at the time was to show Griffith that she could do an excellent job in the classroom without a master's degree. Around that same time, Plaintiff told Larry McElroy, Principal of the Upper School, about her concerns that Griffith was trying to replace her with another French teacher. Just before spring break in March 2010, when BGA typically issues employment contracts to teachers for the following academic year, Plaintiff was told by either McElroy or Rupley that she would not receive her contract for the following year at the usual time. Griffith, she was told, was withholding her contract because he wanted to meet with her after spring break to discuss her plan for obtaining a master's degree in French.

After returning from spring break, Plaintiff discussed various master's degree programs with Griffith, Rupley, and McElroy. After researching the programs offered at local universities, she determined that none would allow her to obtain a master's during the summer. Instead, she discovered a summer master's program in French at Middlebury College in Vermont. In a series of emails in early and mid-April, she and Rupley discussed the high cost of attending the four-year Middlebury program. Rupley suggested that she submit a request for supplemental faculty continuing education funding to cover the difference between what BGA would normally pay a staff member returning to school (50 percent of the annual cost of the degree program's in-state tuition rate; here,

4

$1,651.50) and the annual cost of attending Middlebury ($7,008).[2]  Around that time, in April or May 2010, she informed Griffith that she was applying to the Middlebury master's program. Shortly thereafter, in early May, she was issued her contract for the 2010-11 school year. It did not mention a requirement that she obtain a master's degree. On May 7, she signed and returned it.

On May 23, Plaintiff emailed Rupley her request for financial aid for graduate studies. The following day, McElroy asked Plaintiff if she thought she would be able to go to Middlebury. She replied that she could not afford it without substantial financial aid from BGA. He responded that he understood how she felt. Around this same time, Plaintiff told McElroy that she felt she was being singled out by Griffith and treated differently—unfairly so—from her colleagues. In that conversation, Plaintiff testified, she made it clear to McElroy that she believed her age was the reason for her unfair treatment, and she asked him to talk with Griffith about that concern. He assured her that others felt the same way she did. On May 25, Plaintiff learned that Griffith had denied her request for supplemental funding beyond 50 percent of the cost of in-state tuition ($1,651.50). This action aligned with BGA's standard practice, although in a prior instance, Griffith had granted two technology employees $1,000 each for a $1,500 course, a subsidy greater than 50 percent.

Plaintiff sent a letter dated May 31, 2010, to BGA Board Executive Committee Member Jim Cross, whom she had heard was critical of Griffith's leadership. In the letter, Plaintiff described Griffith's master's degree requirement and her inability to meet it. She discussed Griffith's recent offer of a job teaching math (among other responsibilities) to a

---

[2] BGA's written policy does not clarify that its tuition reimbursement is up to 50 percent of "in-state" tuition, but Rupley testified that it has always been BGA's practice to pay based on the in-state rate, subject to an exception described below.

teacher who lacked a degree in math, Todd Moran, and told Cross about Griffith's untruthful statement to her denying that he had offered the man a job. She stated her concern that she would be fired when Griffith discovered she was not working on her master's degree, and that she would be replaced by a certain "much younger teacher with her doctorate in French." Plaintiff concluded that it was "devastating" to think that she would be fired

> because someone like John Griffith values degrees more than hard work, loyalty, and commitment and apparently has a personal vendetta against me. It is obvious to most of us at BGA that we are not valued unless we were hired by him and have what he considers to be the appropriate degree from the appropriate school. I think I speak for all of us who have the misfortune of being 50 or older in saying that our veteran status is not seen as a positive . . . much to the contrary. We all feel that our days are numbered as long as he is in charge.

Plaintiff received no reply from Cross. She did not enroll at Middlebury that summer.

In early August 2010, Plaintiff returned to school for the new academic year. McElroy and Rupley asked her if she had gone to Middlebury over the summer. She told them she had not, due to the lack of financial assistance. They were surprised by this news. About a week later, after school had resumed, Plaintiff ran into Griffith, who inquired about the Middlebury program. She informed him that she did not attend. He left the room without responding. On August 17, Plaintiff sent a letter to Griffith, copying McElroy, to discuss her failure to enroll in the master's degree program. She explained the "financial burdens" on her family that prevented her from "following through with this commitment" and complained that she was being treated differently from other teachers. "This issue seems to stem from a personal grudge that you harbor against me," she wrote, characterizing it as a "personal vendetta" stemming from the earlier conflict she had while

6

working in the college counseling office. "I wonder if your focus on me is motivated by the desire to hire someone who is less experienced and therefore would begin at a lower salary," she continued, referring to her "hope" that her "age and experience would be seen as a positive, not a negative." Griffith did not reply to the letter.

Around that time, McElroy showed Griffith the letter Plaintiff had written to Jim Cross. Griffith was irate and stated that Plaintiff was "going to have to go." On August 27, 2010, McElroy, acting at Griffith's instruction, told Plaintiff that she was being discharged because she wrote a letter to a board member and because she did not go back to school to obtain her master's degree. Two days prior, Griffith had hired a French teacher with a doctorate in French, Ashlee Headrick, who was in her 30s. On August 30, he emailed the BGA Board's Executive Committee to notify them about the personnel change, in the process making two misstatements about the situation that led to Plaintiff's termination. Plaintiff's termination took effect September 2, 2010.

## LEGAL STANDARD

A party may obtain summary judgment if the evidence establishes that there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

Defendants ask the Court to grant summary judgment in their favor on all of Plaintiff's claims, namely: discrimination and retaliation under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-101 *et seq.*; retaliatory discharge in violation of Tennessee common law; and, with respect to Griffith individually, aiding, abetting, compelling, or commanding discriminatory and retaliatory conduct, and engaging in retaliation, both in violation of the THRA. The Court will discuss each claim in turn.

## I.     Retaliation (ADEA and THRA)

Defendants argue that Plaintiff cannot establish a *prima facie* case for retaliation because she did not engage in protected activity. They maintain that her letters to Cross and Griffith, respectively, do not constitute "opposition" to a purportedly discriminatory employment practice,

as required by the ADEA, because they do not sufficiently allege age discrimination. The letters allege unfair treatment based on a personal vendetta, they contend, but do not provide notice that Plaintiff was threatening a discrimination lawsuit. Next, Defendants argue that Plaintiff cannot establish that BGA's legitimate, non-retaliatory reason for discharging her—her failure to pursue a master's degree in French during the summer of 2010—was in fact a pretext for retaliation. Finally, Defendants argue that retaliation claims against individual managers are not cognizable under either the ADEA or THRA, and thus they request dismissal of any retaliation claims against Griffith.

Plaintiff responds that her burden of establishing a *prima facie* case of retaliation is easily satisfied under the law. She argues that "protected activity" is interpreted broadly and includes "complaining to anyone," "refusing to obey an order," and any communication that informs an employer of the employee's belief that she is being retaliated against. (Docket No. 21, at 19). Thus, she contends, she engaged in protected activity by writing two letters that mentioned being treated differently because of age, as well as reporting her age discrimination concerns to McElroy on numerous occasions and receiving his assurances that he was communicating her concerns to Griffith. Plaintiff argues that she has presented evidence of causation in the form of testimony that Griffith was angry that she had contacted a board member and immediately announced his decision to fire her. Plaintiff next argues that a reasonable jury could conclude BGA's reason for terminating her was pretextual for three reasons: first, she had in fact been "pursuing" a master's degree in French, albeit unsuccessfully; second, Defendants' have changed their reasons for discharging her, which is suspicious and gives rise to an inference of pretext; and third, a reasonable jury could find BGA's stated reasons unworthy of credence. Finally,

Plaintiff responds that she is not pursuing a retaliation claim against Griffith under the ADEA, only under the THRA, which she argues permits retaliation claims against individual defendants.

**A.      ADEA Claim**

The ADEA prohibits an employer from "discriminat[ing] against any of his employees . . . because such individual . . . has opposed any practice made unlawful under [the ADEA]," or has caused, testified, or participated in an official investigation under the ADEA. 29 U.S.C. § 623(d). Plaintiff may establish retaliation "either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Absent direct evidence of retaliation, courts apply the *McDonnell Douglas/Burdine* discrimination burden-shifting framework to analyze retaliation claims at the summary judgment stage. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)). Because Title VII's anti-retaliation provision is similar to the ADEA's anti-retaliation provision, it is appropriate to look to cases construing Title VII as a source of authority when construing the ADEA's anti-retaliation clause. *Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 591 (6th Cir. 2007) (citing *Wathen v. General Elec.*, 115 F.3d 400, 404 n. 6 (6th Cir. 2007) (because liability schemes under Title VII, ADEA, and ADA are functionally the same, court's analysis may properly rely on case law interpreting any of the three acts). The ADEA and its sister civil rights statutes do not recognize a cause of action against a supervisor in his individual capacity, only against an "employer." *Hiler v. Brown*, 177 F.3d 542, 546 (6th Cir. 1999) (citing *Wathen*, 115 F.3d at 405).

10

To make out a *prima facie* case of retaliation, Plaintiff must establish that: (1) she engaged in protected activity under the ADEA; (2) BGA knew that she engaged in the protected activity; (3) BGA subsequently took an adverse employment action against her; and (4) the adverse action was causally connected to the protected activity. *Spengler*, 615 F.3d at 492-93. The burden of proof at the prima facie stage of a retaliation action is "minimal" and "not onerous, but one easily met." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009); *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008).

If Plaintiff establishes her *prima facie* case of retaliation, the burden shifts to BGA to produce evidence of a legitimate, nondiscriminatory reason for its actions. *See Imwalle*, 515 F.3d at 544. At this stage of the *McDonnell Douglas/Burdine* analysis, the defendant's burden is one of production, not persuasion, and no credibility assessment is to be made. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). The burden of persuasion remains with the plaintiff at all times. *Weigel v. Baptist Hosp. of East Tenn.*, 302 F.3d 367, 378 (6th Cir. 2002).

If BGA can produce a legitimate, nondiscriminatory reason for its actions, the burden of production shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason offered by BGA was a pretext designed to mask retaliation. *Burdine*, 450 U.S. at 253. Plaintiff can meet this burden by showing that: (1) BGA's stated reason for terminating her has no basis in fact, (2) the reason offered for her termination was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the BGA's action. *Imwalle*, 515 F.3d at 545 (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). "Once a plaintiff establishes its *prima facie* case, this, along with disbelief of the

11

defendant's proffered reasons for the negative employment action, will permit a finding of discrimination by the factfinder." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 347 (6th Cir. 1997) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)); *see also Reeves*, 547 U.S. at 148 (discussing the context-specific analysis called for by *Hicks* and holding that it is error to require all Plaintiffs to introduce additional evidence of discrimination when "sufficient evidence to reject the employer's explanation may permit a finding of liability").

### 1.    Protected Activity

BGA argues that the two letters Plaintiff wrote did not amount to protected activity because they did not sufficiently allege age discrimination.[3] Noting that "A vague charge of discrimination in an internal letter or conversation is not sufficient to constitute opposition," *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989), BGA points out that Plaintiff's letters to Cross and Griffith barely mention age discrimination. (Docket No. 15, at 10). Plaintiff, for her part, responds that "protected activity" is interpreted broadly and includes "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices." (Docket No. 21, at 22) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579-80 (6th Cir. 2000) and *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 571 (6th Cir. 2009)).

If the entirety of Plaintiff's opposition to the allegedly discriminatory practice consisted of her two letters, whether or not she had engaged in protected "opposition" under the ADEA would be a close call. In the letters, she complained about a "personal vendetta," a "personal grudge," and being "singled out" and fired "because someone like John Griffith values degrees more than hard work, loyalty, and commitment," and was concerned with "saving money in

---

[3] BGA is the only Defendant against which Plaintiff asserts an ADEA retaliation claim. In her Complaint, Plaintiff appears to plead an ADEA retaliation claim against "Defendants" (Docket No. 1, at ¶ 30), but she has since explicitly disavowed it. (Docket No. 21, at 25).

12

today's economy"—none of which alleges age discrimination. (Docket No. 19-5, at 8-9, 12-13). However, Plaintiff also referred to her "age and experience" and, in the letter to Cross, included a dire concluding remark on behalf of all teachers "who have the misfortune of being 50 or older": "We all feel that our days are numbered as long as he is in charge." *Id.*, at 9. That statement explicitly mentions age, and it alludes to termination based on the lone characteristic of age. A reasonable jury could consider it, in a letter mailed to a member of the BGA Board's Executive Committee, sufficient opposition to put Defendants on notice that Plaintiff believed her unfair treatment stemmed from the fact that she is over the age of 50.

BGA cites *Barber v. CSX Distrib. Servs.* and *Willoughby v. Allstate Ins. Co.* to support its contention that Plaintiff did not engage in protected activity, but the comparisons are inapt. *See* 68 F.3d 694 (3rd Cir. 1995); 104 Fed. Appx. 528 (6th Cir. 2004). In *Barber*, the plaintiff's letter to the defendants' human resources department only expressed the plaintiff's puzzlement, given his "21 years of experience in this field," that "the position was awarded to a less qualified individual." 68 F.3d at 697. A panel of the Third Circuit held that the letter did not constitute protected activity because it did not "explicitly or implicitly allege that age was the reason for the alleged unfairness." *Id.* at 702. While it is true that the instant Plaintiff made abundant non-age-related references to her experience and qualifications as a teacher, she also explicitly referred to teachers of a certain age worrying that they faced termination as long as Griffith was headmaster—a crucial allegation the *Barber* plaintiff never made.

*Willoughby* is also distinguishable from the case at bar. In that case, Willoughby, a white male who was demoted after telling black subordinates a racially offensive joke (the day before firing one of them) wrote a letter contesting his demotion. In the letter, he mentioned some past sexual harassment complaints against his subordinate in order to impeach his accuser's

13

credibility, and he obliquely cited the high number of white employees who had recently left Allstate's employ. A Sixth Circuit panel, in a brief per curiam opinion, held that Willoughby's letter did not constitute protected activity because in the letter he was "contesting the correctness of a decision made by his employer" rather than asserting discrimination. 104 Fed. Appx. at 531. Importantly, the decision to demote Willoughby had already been made and carried out by the time he wrote his letter contesting his employer's rationale. In the instant case, however, Plaintiff was challenging an allegedly discriminatory condition of her employment by notifying a BGA board member *before* BGA took any adverse actions against her. Her age discrimination allegation may have been a small part of her letter and may not have directly threatened suit, but it at least warned of age-based discrimination before she was fired.

Most importantly, Plaintiff's asserted "protected activity" also included conversations with her supervisor Larry McElroy in which, according to Plaintiff's testimony, she told him that she "was fearful for [her] job" and was "worried that [her] age and [her] veteran status might be an issue." (Docket No. 19-1, at 12).[4] She testified that she said, "I feel like those of us who have been here a long time, those of us who are specifically 50 and over, that we are not respected and that Dr. Griffith was eager for us, anxious for us to leave." *Id.* at 12-13. She also claims she asked him to share these concerns with Griffith. *Id.* at 13. McElroy, for his part, recalls the conversations but does not recall Plaintiff stating that age was the basis for her fears. (*See, e.g.*, Docket No. 19-4, at 158). Nonetheless, Plaintiff's testimony, if believed by a jury, would qualify

---

[4] BGA argues (without citing legal authority) that Plaintiff is impermissibly trying to identify "additional protected activity" that contradicts the allegations in her complaint. (Docket No. 25, at 4). While Plaintiff does not mention the statements to McElroy in her complaint, nothing she pleads is contradicted by these allegations. Moreover, no heightened pleading standard can govern an employment discrimination claim. *Swierkiewicz v. Sorema N.A.*, 534 U.S 506, 514 (2002) (Title VII plaintiff need not plead a *prima facie* case as long as the complaint contains a short and plain statement of the claim and gives "fair notice" of its basis); *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012)(recognizing continued applicability of *Swierkiewicz*'s holding).

14

as protected opposition because she put management on notice of her belief that she was experiencing age discrimination. *See Johnson*, 215 F.3d at 579 (protected opposition among other things includes "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices"). This dispute of material fact alone precludes summary judgment on the retaliation claim; a swearing contest between two parties to a conversation must be resolved by the factfinder.

Finally, a finding that Plaintiff engaged in protected opposition upholds the broad remedial purposes of the ADEA and avoids retroactively sanctioning an employer for conduct that could only be considered retaliatory in hindsight. To the extent that courts consider whether "a reasonable person in [the employer's] position would have understood that [the plaintiff] was threatening a discrimination suit," as Defendants assert, it is clear that BGA and Griffith understood that Plaintiff might sue them as a result of her termination. (*See* Docket No. 15, at 10) (quoting *Burns v. Republic Savings Bank*, 25 F. Supp. 2d 809, 828 (N.D. Ohio 1998)). After first consulting with a lawyer and then terminating Pigott, Griffith advised the Executive Committee "about a personnel issue that may involve litigation." (Docket No. 19-9, at 27). According to Plaintiff's testimony, which is disputed by McElroy, after informing her that Griffith was angry that she had written to Cross, McElroy advised her that "it probably would be a good idea" to consult an attorney. (Docket No. 19-1, at 138). BGA and Griffith were aware of the potential for litigation, and were a jury to believe Pigott's testimony, it could reasonably conclude that her letters to Cross and Griffith and her conversations with McElroy put Defendants on notice that she was threatening an age discrimination claim. Given the Sixth Circuit's "broad interpretation of 'protected activity,'" *Simpson*, 359 Fed. Appx. at 571, the Court finds that Plaintiff satisfies

15

her "easily met" burden of presenting sufficient evidence that she engaged in protected activity. *See DiCarlo*, 358 F.3d at 420.

### 2. Legitimate, Nondiscriminatory Reason, or Pretext for Discrimination

Defendants do not challenge other elements of Plaintiff's *prima facie* retaliation case but assert that she Plaintiff was fired for a legitimate nondiscriminatory reason, namely that she failed to pursue a master's degree in French. They contend that Plaintiff cannot demonstrate that their reason for firing her was pretextual. Plaintiff argues that she was pursuing a degree, that BGA's reason for terminating her has changed suspiciously and thus gives rise to an inference of pretext, and finally, that a reasonable jury could find that BGA's reason for terminating her is unworthy of belief and, thus, pretextual.

As an initial matter, BGA has satisfied its burden of producing evidence of a legitimate, nondiscriminatory reason for terminating Plaintiff. *See Imwalle*, 515 F.3d at 544. Plaintiff does not dispute that she was told that her continued employment was contingent upon her pursuit of a master's degree in French. She referred to it as her "commitment" (Docket No. 19-9, at 24) and worried that she would be fired "when [Griffith] discovers I cannot afford to go back to school this summer and start working on my graduate degree" (Docket No. 19-9, at 22). Griffith testified that the sole reason he decided to terminate her was because she failed to begin the master's program at Middlebury. (Docket No. 19-8, at 183). There is nothing inherently discriminatory about firing an employee who fails to fulfill a condition of her employment. Accordingly, the Court finds that BGA has produced sufficient evidence of a legitimate, nondiscriminatory reason to meet its burden of production under this prong of the *McDonnell Douglas* analysis. *See Chattman*, 686 F.3d at 349.

However, Plaintiff has produced enough evidence to allow a reasonable jury to find that BGA's proffered reason was pretextual, and that she was actually terminated because of her complaints of age discrimination. In the Sixth Circuit, an "essentially . . . two-part showing"—that the employer's stated reason was pretextual, and that its true motive was retaliation—is required to rebut an employer's evidence of its legitimate, nondiscriminatory reason for taking adverse action. *See Imwalle*, 515 F.3d at 547. "In an age discrimination case, a plaintiff can establish pretext by demonstrating either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 319 (6th Cir. 2007) (internal quotations omitted); *Romans v. Michigan Dept. of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012). The Supreme Court has explained that a jury may infer discrimination from persuasive proof that a defendant's explanation is unworthy of credence. *Reeves*, 530 U.S. at 147. Thus, the Sixth Circuit has held that "a plaintiff's prima facie case, combined with disbelief of the defendant's proffered reasons for the negative employment action, permits a finding of retaliation by the factfinder." *Imwalle*, 515 F.3d at 545 (citing *Abbott*, 348 F.3d at 542, and *Kline*, 128 F.3d at 347).

Plaintiff's argument that she was in fact "pursuing" a master's degree, and thus Defendants had no cause to dismiss her, lacks merit. "Pursue" means "to carry on further, proceed with, continue, follow up (a course of action begun); to take further action with regard to (a matter)." Oxford English Dictionary (3d ed. 2007). Plaintiff had ceased her efforts to obtain a master's degree by late May 2010 and recognized that Griffith would see it as grounds for termination. Had Defendants instructed her to "investigate" or "research" master's degree programs, this line of argument would be worth—well, pursuing. But no reasonable jury could

17

buy the argument that Plaintiff was pursuing a master's degree, and thus BGA's stated reason was false.

Still, BGA's account of its reason for terminating Plaintiff's employment suffers from a number of defects that would permit a factfinder to believe that her failure to pursue a master's did not actually motivate her discharge. *See Manzer*, 29 F.3d at 1084. "An employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Asmo v. Keane, Inc.*, 471 F.3d 588, 596 (6th Cir. 2006) (quoting *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1167 (6th Cir. 1996) *am. on other grounds*, 97 F.3d 833 (6th Cir. 1997). "By showing that the defendants' justification for firing him changed over time, [plaintiff] shows a genuine issue of fact that the defendants' proffered reason was not only false, but that the falsity was a pretext for discrimination." *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). The record reflects different justifications for Plaintiff's termination. McElroy, who terminated Plaintiff at Griffith's instruction, told Plaintiff that she was being fired because she wrote a letter to a board member and because she had not begun work on her master's degree. (Docket No. 19-4, at 178-81). McElroy subsequently stated that he merely inferred the first of those two reasons because Griffith was "irate" about Plaintiff's letter to Cross and stated that Plaintiff was "going to have to go," but that failing to begin her master's program was the only reason for her termination. *Id.* at 185-86. McElroy produced backdated notes of the August 27, 2010, meeting that included the justification that Plaintiff's letter to Cross was considered insubordinate. *Id.* at 199-200. Presently, Defendants contend that failing to pursue a master's degree was the sole basis for her termination. The fact that BGA told Plaintiff that her letter to Cross was one reason for her termination, but now no longer asserts it, is an issue of material fact for the jury.

18

Griffith's account of the reasons for Plaintiff's termination also suffers from inconsistencies that could lead a reasonable jury to discredit it. In an email to BGA board members explaining Plaintiff's termination, he stated that "Essentially [Pigott] was on probation for the 2008-2009 school year and the 2009-10 year." (Docket No. 19-9, at 28). He subsequently acknowledged that the statement was not true: she had been "essentially on probation" only for the 2009-10 school year. (Docket No. 19-8, at 192). In the letter, he also stated that he "made her employment the year before last contingent on her doing course work in French toward a B.A. or M.A." (Docket No. 19-9, at 28). Of course, Griffith later testified this was not true either, as Pigott was never given the option to pursue course work toward a B.A. in French—which would have been easier to obtain given her undergraduate minor in French—and it was not discussed until 2009, the year prior. (Docket No. 19-8, at 193-94). His inconsistent statements about the rationale for Plaintiff's termination could lead a factfinder to find that the proffered reasons did not actually motivate her discharge.

Finally, Defendants' inability to articulate and implement consistent policies leave factual disputes that could permit a reasonable jury to discredit their nondiscriminatory reason for terminating Plaintiff. Griffith testified that his policy was to require that every teacher (with certain exceptions) obtain a bachelor's or graduate degree in his or her teaching field, but he did not put the policy in writing (Docket No. 19-8, at 90), nor did he enforce it consistently. McElroy has struggled to articulate BGA's policy for upper-school teacher educational backgrounds, stating at some times that they must have a bachelor's degree in their subject area and at others that they must have a bachelor's degree of some sort and at least a minor in their subject area. (*See* Docket Nos. 19-4, at 30-1, and 19-1, at 118). The policy was first invoked against Plaintiff in spring 2009, after she had been teaching French for several years. Griffith testified that he had

19

never required another teacher to obtain a master's degree in order to continue teaching. (Docket No. 19-8, at 116). Furthermore, Plaintiff was not given the option to complete her bachelor's in French, as the policy would seem to provide, and Griffith testified that he does not know why he did not give her that option. (Docket No. 19-8, at 153-55).

Griffith's policy did not apply to teachers who had other substantial extracurricular duties, including coaching, but what constituted "substantial extracurricular duties" was only vaguely defined. (Docket No. 19-8, at 87-89). In one instance, Griffith testified that the policy was not applied to a teacher whose extracurricular duty was serving as Chair of the History Department, notwithstanding her lack of a degree in history, because she was very close to retiring—a justification not contemplated by the policy, and which could lead a jury to find that Plaintiff's failure to pursue her master's was "insufficient to motivate discharge." (Docket No. 19-8, at 98-101). In another, Griffith attempted to hire Todd Moran, a teacher in his twenties who lacked a degree in math, as a full-time math teacher—a point McElroy raised with Plaintiff during their conversation about her treatment and with Griffith when resisting his decision to terminate Plaintiff.[5] (Docket No. 19-4, at 92-96); *cf. Peters v. Lincoln Elec. Co.* (evidence that other employees, particularly those not in protected class, were not fired for substantially similar conduct can satisfy pretext requirement) (citing *Manzer*, 29 F.3d at 1084). It is also apparent from the record that BGA's written procedure for employees seeking to contest allegedly discriminatory actions by the headmaster required them to raise the issue with the headmaster's subordinate or the headmaster himself. (Docket Nos. 19-8, at 160-62, and 19-1, at 18-22). Considering all the circumstantial evidence together, a factfinder could disbelieve Defendants'

---

[5] Griffith allegedly denied offering Moran a job (Docket No. 19-5, at 8) and then testified inconsistently in his deposition about whether the position was full-time or part-time. (*See* Docket No. 19-8, at 47 and 58). Griffith stated that Moran would have fallen within the exception to his policy as a "potential coach," a "coaching prospect," and a "potential administrative candidate." *Id.* at 46.

stated reason and conclude that retaliation was "more likely" the reason for Plaintiff's termination. *See Manzer*, 29 F.3d at 1084.

The Court will not second-guess the lawful business decisions of an employer, but it cannot grant summary judgment where the rationale for terminating Plaintiff has changed over time, at one point included factually inaccurate statements, and depends upon policies that are vaguely defined and inconsistently applied. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 n.6 (6th Cir. 2008) (noting that the Sixth Circuit has never adopted a deferential "business-judgment rule" in discrimination cases and thus "the question of whether the employer's judgment was reasonable or was instead motivated by improper considerations is for the jury to consider"). In *Spengler*, a Sixth Circuit panel held that a jury could find pretext and discrimination based on evidence of selective enforcement of a workplace policy, factual inconsistencies in the record, and proof that the plaintiff was a valuable employee when he was terminated. 615 F.3d at 494-95. Plaintiff in the instant case could make a similar showing, and additionally she can produce evidence that she complained of age discrimination and was told by her supervisor that the complaint led to her discharge. Based on the record, it is unclear exactly what degree a teacher needed to have in order to continue teaching, who was exempt from the requirement, to whom a teacher was supposed to complain in the event of discrimination by the head of school, or, in Plaintiff's case, why exactly she was fired. Under these facts, a reasonable jury could find pretext and draw an inference of retaliation. Accordingly, the Court declines to grant summary judgment on the ADEA retaliation claim against BGA.

**B.     THRA Claims**

For the reasons discussed above, the Court will also deny summary judgment on the state-law retaliation claim against BGA. "Tennessee courts have looked to federal case law

applying the provisions of the federal anti-discrimination statutes as the baseline for interpreting and applying the [THRA]." *Newman v. Fed. Exp. Corp.*, 266 F.3d 401, 406 (6th Cir. 2001) (internal quotation omitted); *see also Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 620 (6th Cir. 2006) ("We apply the same analysis to age-discrimination claims brought under the THRA as those brought under the ADEA"). After some turbulence in state Supreme Court precedent, *see Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 779, 785 (Tenn. 2010), the Tennessee legislature codified the federal *McDonnell Douglas* framework in state law, Tenn. Code Ann. § 4-21-311(e). *See Bobo v. United Parcel Service, Inc.*, 685 F.3d 741, 757-58 (6th Cir. 2012). Applying this framework in the same manner as above, genuine issues of material fact preclude summary judgment on Plaintiff's retaliation claim against BGA.

Furthermore, the retaliation claim against Griffith individually is cognizable under the THRA. *Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364, 377 (Tenn. Ct. App. 2005) (individual liability may attach for retaliating or aiding and abetting under Tenn. Code Ann. § 4-21-301(1) or (2)), *perm. app. denied* March 20, 2006; *see also Allen v. McPhee*, 240 S.W.3d 803, 820-23 (Tenn. 2007) (noting that "a person or entity may be found liable for retaliation" under the THRA and proceeding to analyze retaliation claim against individual defendant under federal retaliation standard) *abrogated on other grounds by Gossett*, 320 S.W.3d at 784; *Briordy v. Chloe Foods Corp.*, 3:07-0295, 2008 WL 587503 (M.D. Tenn. Feb. 29, 2008); *Hajizadeh v. Vanderbilt Univ.*, 3:10-CV-00817, 2012 WL 2947586 (M.D. Tenn. July 19, 2012). For the reasons articulated in the preceding section, the Court will not enter summary judgment in favor of Griffith on the THRA retaliation claim.

## II.     Discrimination (ADEA and THRA)

For the purpose of their summary judgment motion, Defendants do not dispute that Plaintiff can establish a *prima facie* case of age discrimination. Instead, they argue that she cannot demonstrate that Defendants' legitimate, non-discriminatory reason for terminating her employment—her failure to pursue a master's degree in French—is a pretext for age-based discrimination. Plaintiff responds that Defendants have failed to clearly set forth a legitimate, non-discriminatory reason for terminating her, and that even if they have, she has presented sufficient evidence to allow a reasonable jury to find Defendants' proffered explanation unworthy of credence.

The *McDonnell Douglas*/*Burdine* framework governs age discrimination claims lacking direct evidence under the ADEA and THRA. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811-12 (6th Cir. 2011); *Bender*, 455 F.3d at 620. To establish a prima facie case of age discrimination, a plaintiff must show: "(1) [s]he was at least 40 years old at the time of the alleged discrimination; (2) [s]he was subjected to an adverse employment action; (3) [s]he was otherwise qualified for the position; and (4) [s]he was replaced by a younger worker." *Mickey v. Zeider Tool & Die Co.*, 516 F.3d 516, 521 (6th Cir. 2008) (citing *Tuttle*, 474 F.3d at 317). After the prima facie case is established, the analysis tracks the retaliation analysis discussed in Section I. BGA bears a burden of production: it must proffer evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Upshaw*, 576 F.3d at 585 (6th Cir. 2009). Finally, if BGA articulates such a reason, the burden shifts back to Plaintiff to show that this reason is pretextual. *Mickey*, 516 F.3d at 521 (citing *Reeves*, 530 U.S. at 143).

At this stage, Defendants concede Plaintiff's prima facie case: she was 53 years old at the time she was terminated; she was otherwise qualified for the position; and she was replaced by a

23

younger teacher. They cite her failure to pursue a master's degree in French as the legitimate, nondiscriminatory reason for her termination, and for the reasons explained in Section I, the Court finds that they have met their burden of production. However, as explained in Section I, Plaintiff has produced sufficient evidence to allow a reasonable jury to discredit BGA's reasons and infer that other reasons, including age discrimination, led to her termination. Only a jury can decide whether BGA's legitimate reason for terminating Plaintiff, notwithstanding evidence of its changing rationale and unwritten, unevenly enforced policies, is more likely to have motivated her discharge than age-based discrimination. *See White*, 533 F.3d at 393 n.6. This is not to say that a jury will find that Plaintiff was discriminated against, only that summary judgment for BGA on her discrimination claims is inappropriate.[6]

## III. Retaliatory Discharge (Common Law)

Defendants argue that Plaintiff's common-law retaliatory discharge claim is preempted by the THRA. Citing *England v. Fleetguard, Inc.*, 878 F. Supp. 1058, 1064 (M.D. Tenn. 1995), they contend that under Tennessee law, if a statute creates and right and remedy where no common-law right or remedy had previously been recognized, the statute is presumed to be exclusive. Because the THRA was enacted six years before the common-law tort of retaliatory discharge was recognized in Tennessee, they argue, the remedies under the THRA are exclusive. Plaintiff argues that her case is procedurally distinguishable from *England* and, more importantly, that *England* was "squarely rejected" by this court in *Werlein v. Brink's Home Sec., Inc.,* No. 3:04–0911, 2005 WL 3417308 (M.D. Tenn. Dec.13, 2005), which held that the THRA

---

[6] Griffith cannot be held individually liable for discrimination under either the ADEA or the THRA. *See Wathen*, 115 F.3d at 405, and *Carr v. United Parcel Serv.*, 955 S.W.2d 832, 835 (Tenn. 1997) *overruled on other grounds by Parker v. Warren County Util. Dist.*, 2 S.W.3d 170 (Tenn. 1999). A different section of the THRA imposes individual liability for retaliation and for aiding, abetting, inciting, compelling, or commanding discrimination. *See supra* Section I.B. and *infra* Section IV.

was not the exclusive remedy for a whistleblower claim under the Tennessee Public Protection Act ("TPPA") and the common law.

Defendants state the law correctly here. The basic framework for preemption under Tennessee law was articulated in *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992), which made it clear that the legislature is presumed to know the state of the law when it creates a statutory right: if no common-law right exists, the statutory right is presumed to be exclusive. The THRA was enacted in 1978, six years before the Tennessee Supreme Court first contemplated a cause of action for retaliatory discharge, *see Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 445 (Tenn. 1984), and eight years before it fully recognized it, *see Chism v.Mid-South Milling Co., Inc.*, 762 S.W.2d 552, 556 (Tenn. 1988). Therefore, the Court must presume that the THRA provides the exclusive state remedy for "discrimination because of race, creed, color, religion, sex, age or national origin in connection with employment." Tenn. Code Ann. § 4-21-101. Under the terms of the statute, it is a "discriminatory practice" to retaliate against someone who has opposed a practice declared discriminatory by the statute. Tenn. Code Ann. § 4-21-301. Accordingly, the common law tort of retaliatory discharge is preempted by the THRA.

*Werlein* is not to the contrary. In that case, the Court held that a plaintiff who was allegedly fired for reporting his employer's illegal activity had a remedy both under the TPPA, which was enacted two years *after* Tennessee first recognized common-law retaliatory discharge, and through the common-law tort itself. *Werlein*, 2005 WL 3417308 at *7. Distinguishing *England*, the *Werlein* court noted that "Tennessee's statutory and common-law tort causes of action for whistleblower retaliation are directed toward employer conduct that is different in kind from the prohibited discrimination and retaliation that is at the heart of the THRA." *Id.* In other words, while the THRA preempts common-law retaliation claims that relate to discrimination, it

25

does not preempt common-law retaliation claims arising from whistleblowing unrelated to discrimination. In sum, two straightforward propositions can be distilled from *England*, *Werlein*, and the relevant Tennessee precedent: the THRA was enacted before the creation of common-law retaliatory discharge and is thus exclusive with regard to discrimination-based retaliation; the TPPA, in contrast, was enacted after common-law retaliatory discharge and does not preempt retaliatory discharge claims "for 'blowing the whistle' on infractions of rules, regulations, or the law pertaining to the health, safety, and general welfare of the public." *See Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 535 (Tenn. 2002).

Other federal district courts that have recently considered this question agree. *See, e.g., Underland-Williams v. GutterGuard, LLC*, 3:11-0832, 2011 WL 6148672 (M.D. Tenn. Dec. 9, 2011) (concluding that THRA preempts Plaintiff's common law retaliatory discharge claim); *Fonseca v. Golden Living Ctr.-Mountainview*, 4:09-CV-93, 2010 WL 3155984 (E.D. Tenn. Aug. 10, 2010) (endorsing *England* analysis); *Fleming v. Sharp Mfg. Co. of Am.*, 11-2911-STA, 2012 WL 3049624 (W.D. Tenn. July 25, 2012) (noting that THRA provides the exclusive remedy for claimants alleging employment discrimination in Tennessee); *Stacy v. MVT Services, LLC*, 3:11-CV-01241, 2012 WL 2281495 (M.D. Tenn. June 18, 2012) ("Tennessee cases hold that the THRA preempts common law claims for retaliatory discharge"); *McAllister v. Quality Mobile X-Ray Services, Inc.*, 3:12-CV-0078, 2012 WL 3042972 (M.D. Tenn. July 25, 2012) (holding that THRA preempts common-law retaliatory discharge claim).

Accordingly, Plaintiff's common-law retaliatory discharge claim will be dismissed with prejudice.

26

**IV.     Aiding or Abetting Discriminatory Conduct (THRA)**

Defendants argue that Griffith cannot be held liable under the THRA for aiding or abetting discriminatory conduct because all of the affirmative acts Plaintiff cites comprise Griffith's own discriminatory and/or retaliatory conduct. They contend that as a matter of accomplice liability, Griffith could not have aided or abetted conduct that was by all accounts his own. In her response, Plaintiff does not address this argument.

The Court finds that Plaintiff cannot prevail as a matter of law on her accomplice liability claim against Griffith. Within the thicket of liability issues that can arise under the THRA, a few principles are clear. First, an individual supervisor cannot be held liable for discrimination within the scope of his employment as an "employer" under Tenn. Code Ann. § 4-21-102(5). *Carr v. United Parcel Serv.*, 955 S.W.2d 832, 835 (Tenn. 1997) *overruled on other grounds by Parker v. Warren County Util. Dist.*, 2 S.W.3d 170 (Tenn. 1999); *Crutchfield v. Aerospace Ctr. Support*, 202 F.3d 267, at *2 (6th Cir. 1999). Second, an individual can be held liable for retaliation, Tenn. Code Ann. § 4-21-301(1), or for aiding, abetting, inciting, compelling, or commanding another individual or entity's discriminatory practices, Tenn. Code Ann. § 4-21-301(2). *Carr*, 955 S.W. at 836; *see Allen*, 240 S.W. at 819. Third, liability for aiding or abetting under the THRA mirrors the common-law civil accomplice liability standard and requires "affirmative conduct," "separate and distinct from acting as a supervisor." *Dobson v. City of Gallatin*, 3:05CV0521, 2006 WL 3805659 (M.D. Tenn. Dec. 22, 2006); *see also Carr*, 955 S.W. at 836. "Liability, however, is not imposed based on the individual defendant's own discriminatory acts; it requires distinct conduct that aids or abets discrimination by the employer." *Jenkins v. Nashville Pub. Radio*, 3:02CV0179, 2005 WL 3358871 (M.D. Tenn. Dec. 9, 2005).

27

In this case, Griffith is not alleged to have thwarted an investigation into discriminatory conduct or otherwise prevented BGA from taking action in response to a discrimination claim. *See Carr*, 955 S.W.2d at 838 (supervisor can be held liable under an aiding or abetting hostile work environment theory for "encouraging or preventing the employer from taking corrective action"). Indeed, it is Griffith's conduct as a supervisor that gave rise to Plaintiff's allegations of discrimination and retaliation. Lacking an independent factual basis for her accomplice liability theory, Plaintiff cannot prevail on a claim of aiding and abetting. Furthermore, the Court recognizes that § 4-21-301(2) imposes liability for "inciting, compelling, or commanding" another's discriminatory practices, but without the benefit of any briefing by Plaintiff, the Court will not take up this argument.[7] In any event, Griffith already faces liability for his allegedly retaliatory conduct under § 4-21-301(1), and the Court finds no reason to construe the word "commanding" in § 4-21-301(2) in a manner that both makes him liable for the same conduct twice and imposes individual liability on a supervisor for discrimination, contrary to the Tennessee Supreme Court's holding in *Carr*. Accordingly, summary judgment will be granted for Griffith on Plaintiff's claims under § 4-21-301(2).

## CONCLUSION

For the reasons stated above, Plaintiff's discrimination and retaliation claims against Defendant BGA under the ADEA and THRA remain viable, as does Plaintiff's retaliation claim against Griffith in his individual capacity under Tenn. Code Ann. § 4-21-301(1).

Accordingly, Summary Judgment is GRANTED in favor of Defendant Griffith on Plaintiff's claims arising under Tenn. Code Ann. § 4-21-301(2). Summary Judgment is DENIED

---

[7] Plaintiff "cannot rest on the allegations contained in [her] complaint in opposition to a properly supported summary judgment motion made against [her]." *First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 289 (1968).

on all other claims. Plaintiff's common-law retaliatory discharge claim is DISMISSED WITH PREJUDICE.

An appropriate Order shall be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE